UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

DORMITORY AUTHORITY OF THE STATE
OF NEW YORK,

                    Plaintiff,

         -v-

CONTINENTAL CASUALTY COMPANY,

                  Defendant.

-------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED MAR 0 5 2013
```

12 Civ. 281(KBF)

MEMORANDUM
DECISION & ORDER

KATHERINE B. FORREST, District Judge:

This is an insurance coverage dispute over which this Court has diversity

jurisdiction. Prior litigation between the parties and a settlement agreement have

resolved all but a single issue between them arising out of the design and

construction of a fourteen story building (with three additional floors below ground).

Plaintiff, Dormitory Authority of the State of New York ("DASNY") and the

insurer of the architect and engineering firm for the project underlying the dispute,

Continental Casualty Company ("Continental"), have agreed that the single issue

before this Court is "whether the Ice Control Issue arises out of the same or related

wrongful acts identified in the May 30, 2002 Demand." (See Lodge Aff. (ECF No.

36), Ex. N at 5-6.) The parties have agreed that the action is best resolved by way of

cross-motions for summary judgment.[1] The critical facts are not in dispute.

---

[1] On February 13, 2013, the Court requested limited additional briefing on the question of whether,
if the Court found the phrase "related to" unambiguous, a trial would be required to determine if the
events at issue were related or not. The parties submitted additional materials and statements

The parties' motions were fully briefed as of November 28, 2012; the limited additional briefing requested by the Court was submitted on February 20, 2013. For the reasons set forth below, the Court grants plaintiff DASNY's motion for summary judgment. Defendant Continental's cross-motion is denied.


## BACKGROUND

The facts set forth below are undisputed unless otherwise noted.

In 1995, plaintiff DASNY entered into an agreement with Kohn Pedersen Fox Associates, P.C. ("KPF") relating to the design and construction of a new building for Baruch College, a fourteen story structure located on Lexington Avenue between East 24th and 25th Streets, in New York City (the "Project"). The agreement between KPF and DASNY provided that KPF's scope of services included detailed program development, architectural and engineering design, production of construction documents, cost estimates, and construction administration in connection with the Project.

In connection with the Project, Continental issued KPF a Professional Liability and Pollution Incident Liability claims-made insurance policy. That policy, or extensions of it, was in effect for period October 29, 2001 through October 29, 2002 (the "2001-2002 Policy"). Continental renewed the policy for periods in 2002-2003 and 2003-2004. By agreement of the parties, the policy here at issue is the 2001-2002 policy (the Policy").

---

which clarified their respective positions and the evidentiary record. Accordingly, as discussed below there is no disputed issue of fact requiring a trial.

**The Policy**

The Policy contains the following relevant provisions:

> NOTICE: THIS IS A **CLAIMS** MADE POLICY. EXCEPT
> TO SUCH EXTENT AS MAY BE PROVIDED HEREIN,
> THIS POLICY IS LIMITED TO LIABILITY FOR THOSE
> **CLAIMS** THAT ARE FIRST MADE AGAINST **YOU**
> DURING THE **POLICY TERM**.
>
> \*\*\*
>
> III. DEFINITIONS
>
> \*\*\*
>
> D. Claim means a demand for money or services, naming you and
> alleging a wrongful act or pollution incident.
>
> \*\*\*
>
> G. Extended reporting period means the end of the period of time after
> the end of the policy term for reporting claims to us that are made
> against you during the applicable extended reporting period arising
> out of:
>
> 1. a wrongful act that took place prior to the end of the policy term that
> is otherwise covered by this policy . . .
>
> \*\*\*
>
> T. Related Claims means all claims made against you and reported to
> us during the policy year arising out of:
>
> 1. a single wrongful act or related wrongful acts . . .
>
> U. Wrongful act means an error, omission or other act that causes
> liability in the performance of professional services . . .
>
> \*\*\*
>
> V. LIMITS OF LIABILITY
>
> \*\*\*

> 3. All related claims shall be considered a single claim first made and reported to us within the Policy year in which the earliest of the related claims was made and reported to us.

(Lodge Aff. Ex. C (the "Policy") at 2, 4-7, 10 (emphasis in original).)

## The Design Issues

The question before this Court is whether the "Ice Control Issue," which the parties agree was not raised in the May 30, 2002 letter setting forth a demand for damages (the "May 30, 2002 Demand" or the "Demand"), arises from or is related to the "Steel Girt Tolerance Issue" that was.[2]  Critical facts with respect to each issue – that enable this Court to make the necessary legal determination on summary judgment – are not in dispute.

The parties agree that KPF was responsible for the architectural and engineering aspects of the design relating to the exterior wall of the building.  This scope of work included both technical and aesthetic aspects of the design.  DASNY also proffered unrebutted evidence that the two issues resulted from different design considerations, made by different design teams and could have occurred irrespective of each other.  (Froessel Aff. (ECF No. 31) Ex. 24 ("Chin Report") at 4.) Continental's Insurance policy expert, Michael J. Conroy, agreed that the wrongful acts that led to the Girt Tolerance Issue were different specific conduct than the wrongful acts that led to the Ice Control Issue.  (See Page Letter Submission dated

---

[2] The Demand raises several issues – one of which is the Steel Girl Tolerance Issue.  While the question for the Court is broadly worded to encompass relatedness of the Ice Control Issue and any issues raised in the Demand, the parties have briefed and discussed the issue as solely whether the Ice Control Issue is related to the Steel Girl Tolerance Issue.  Accordingly, the Court deems the other issues raised in the Demand irrelevant.

Feb. 20, 2013 ("Page Letter Sub.") Ex. 1 at 183.)  Conroy also agreed that different

architectural considerations went into the conduct that led to the Girt Tolerance

Issue versus the Ice Control Issue.  (Id. at 186.)

Conroy also agreed that it was not his position that all claims for professional

negligence against an architect are related to each other if they arise out of the

services the architect performed on a single contract.  (Id. at 190.)  In his report,

DASNY's consultant's expert, Ian Chin, stated that the design errors that caused

the original problems with the delays (which were the subject of the May 30, 2002

Demand, and which also included the Girt Tolerance Issue), were not causally

related to the Ice Control Issue because they could have occurred irrespective of

each other.  (Chin Report at 4.)  Continental's Conroy stated "I would certainly defer

to somebody who is an architect or engineer".  (Page Letter Sub. Ex. 1 at 203.)

Conroy also agreed that the Girt Tolerance and Ice Control Issues resulted in

different harms.  (Id. at 180.)

The Steel Grit Tolerance Issue

There is no dispute that the Girt Tolerance Issue relates to KPF's failure to

include appropriate tolerances for the structural steel girt supporting the exterior

wall in its design.  In a letter dating back to 1997 the issue was described as: "Per

the design, the architectural components (e.g., panels. windows and extrusions . . .)

are being installed directly on to this steel girt system with virtually no tolerance

for adjustment."  (See Lodge Letter Submission dated Feb. 20, 2013 ("Lodge Letter

Sub.") Ex. A.)  KPF's specifications did not accommodate industry standard

tolerances applicable to the manufacture and installation of the steel girts.  (Id.)  In 1999, DASNY received a letter from TDX Construction Corp. which stated that "[t]he main issue is therefore that, the steel wall is erected and installed in accordance with a set of tolerances and the wall panels are designed to meet a different set of tolerances."  (Id. Ex. C.)  In 2002, DASNY's engineering expert at the time, WJE, stated similarly that "the specified tolerances for the profiled metal panel system with the specified tolerances for the supporting structural steel girts. Thus, the profiled metal panel system was not constructible as specified . . ."  (Id. Ex. B.)

According to Chin, and unrebutted in the record, the steel girts are related to the structural steel system that supports the building's curtain wall, but they are not part of the exterior curtain wall system.  (Chin Report at 4.)

There is no dispute that fixing the Girt Tolerance Issue was necessary to construction of the building.  There is no evidence in the record that correcting this tolerance design error had any impact whatsoever – including causing or resolving -- on the design error that resulted in the Ice Control Issue.  There is also no evidence that one design error had any initial causal connection to the other.

The Ice Control Issue

There is no dispute that the design of the building has resulted in excessive (and concerning) ice and snow accumulation.  Commencing in 2001, KPF and DASNY communicated relating to what is here referred to as the Ice Control Issue. The building was then still under construction.  (See Lodge Aff. Exs. H, I (letters to

and from KPF and DASY, March, June 2001).)  The parties agree that concerns regarding this issue were discussed in several communications between them prior to May 2002 (two letters from DASY to KPF expressing concerns regarding accumulation (in March 2001) and a responsive letter from KPF).  (See id.)

The parties agree that the Ice Control Issue relates to a design error by KPF. The issue arises from the curved façade that makes snow and ice more likely to accumulate; and fluted panels on the side of the building in which snow and ice can accumulate.  If the snow and ice dislodge for any reason, it can then "bobsled" down the side and potentially off the building – resulting in potentially dangerous conditions.

Charles Bartlett, DASNY's 30(b)(6) witness, testified that the Ice Control Issue is a result of the corrugated panels and components of the curtain wall system.  (See Lodge Aff. Ex. K at 51-53.)  According to Bartlett, the snow and ice builds up in the flutes.  (Id.)  WJE's October 2012 report, states: "[t]he architectural design of the Baruch Academic Complex – Site B – features a building located in New York City that includes a sloped exterior building façade with vertically corrugated metal siding, deep horizontal window sills and wide horizontal decorative fins that allow significant amounts of snow and ice to accumulate and slide off the building of the façade."  (See Lodge Aff. Ex. M.)

It is undisputed that the Ice Control Issue was first discussed prior to construction, that as construction proceeded and the building finally put into use, it was an increasingly significant concern.  However, the undisputed evidence in the

record is that by this time, the Steel Girt Tolerance Issue had been resolved (as it had to be in order for construction to proceed).

**The May 30, 2002 Demand**

Leading up to May 2002, the Project experienced a series of delays and problems that DASNY attributed to KPF's negligent performance of services.  (See Lodge Aff. Ex. B.)  On May 30, 2002, DASY sent a letter (the "May 30, 2002 Demand") setting forth a claim for damages.  That letter states: "This serves as the [DASNY] claim for damages resulting from [KPF's] negligent performance of services required by [its agreement with DASNY] for [the Project]."  (Lodge Aff. Ex. B.)

This claim letter listed 7 "principal causes" among which were the following:

> 4. Deficiencies in KPF's design of structural elements of elevator shafts and support beams;
>
> 5. KPF's provision of defective and uncoordinated structural steel and exterior building skin designs;
>
> ***
>
> 7. KPF's failure to recognize and correct design errors and omissions and otherswise inadequate or negligent responses to errors in its design.

(Lodge Aff. Ex. B. at 1-2.)

This May 30, 2002 Demand sets forth additional detail on the "Exterior Skin" issue.  (Id. at 6.)  In this regard, the Demand describes the "exterior skin" as "that portion of the exterior enclosure of the building above the sixth floor consisting of a faceted, profiled metal panel system ('siding') with ribbon and punched windows."  The Demand describes the steel issue relating to the "exterior skin design" – this

resulted in a conflict between the structural steel frame and the various exterior systems that attach to the steel frame." (Id. at 6.)  Further, "KPF's construction documents failed to reconcile the specified design and erection tolerances for the siding system with the fabrication and erection tolerances for the steel girts" and that while KPF "was both passive and reticent in identifying design solutions . . . and that KPF also adopted defensive positions rather than being proactive – or even responsive – in correcting negligent design." (Id. at 7.)

The May 30, 2002 Demand concludes by stating, "[t]he negligent design of the building's exterior skin created significant cost overruns in completing the exterior wall construction. KPF is liable to DASNY for those cost overruns." (Id. at 8.)  The Demand commenced what became a lengthy process between the parties to resolve these coverage issues.  Along the way, but concededly not included in the Demand, DASNY raised and sought coverage for the Ice Control Issue.

For instance, in 2004, Travelers Casualty & Surety Company (on behalf of Reliance Insurance Company), sued DASNY and KPF for damages in connection with performance and payment bonds it had issued on behalf of Trataros Construction, Inc. (Lodge Aff. Ex. E.)  DASNY then cross-claimed against KPF for, inter alia, professional malpractice. (Id. Ex. F at 26.)  DASNY asserted that KPF had failed to exercise "the required standard of care, competence and skill in its completion of its duties as architect of record for the Project." (Id.)  DASNY sought ten million dollars in damages in connection with this particular cross-claim. (Id. at 28.)

In 2005, a consultant for the project, RWDI Consulting Engineers & Scientists, wrote to DASNY with its findings with regard to the Ice Control Issue. That letter stated that "an overriding factor in the snow/ice problems that this building has experienced is due to the backward sloping facades, in combination with the complex metal cladding system used." (Lodge Aff. Ex. J.)

In connection with the instant litigation, DASNY has proffered the opinion of WJE's Chin, an engineer who evaluated the Steel Girt Tolerance and Ice Control design issues.  Continental has not proffered its own engineering opinion for this litigation – but has referred to portions of DASNY's engineers' reports; Continental has independently proffered only the expert opinion of Conroy, an expert in insurance policies.  (See, e.g., Froessel Aff. Exs. 1, 2 (attaching the Expert Report and Rebuttal Report of Jim Leatzow); Lodge Aff. Exs. L, M (attaching reports of Wiss, Janney, Elster Associates, Inc. ("WJE" )).)

In 2009, on behalf of Continental (as insurer for KPF), WJE identified two design errors by KPF – one relating to steel tolerances for the metal wall system that formed the exterior wall of the building (what has been referred to herein as the Steel Girt Tolerance Issue), and another relating to snow and ice accumulation. With respect to the latter issue, this 2009 report states that "[s]now and ice accumulation on buildings located in northeast United States is always a design consideration . . . .  In buildings having sloping roofs, or sloped or curved facades, the building design must incorporate features that can either prevent significant accumulation, or are capable of containing this accumulation on the building."

10

(Lodge Aff. Ex. L at 4.)  The summary continues, "KPF did not include provisions for either containing this accumulation on the building façade, or for preventing such accumulation from occurring."  (Id. Ex. L at 5.)

In 2012, WJE provided another opinion.  This report similarly opines that KPF made design errors relating to the tolerances for the steel girt as well as snow and ice accumulation.  It also states, however, that these design issues are "separate and unrelated" as the steel issue was technical and the snow and ice issue "related to the aesthetics."  (Id. Ex. M at 4.)

## LEGAL STANDARDS

### Summary Judgment Standard

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R Civ. P. 56(c).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In making that determination, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor."  Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials"

contained in the pleadings.  Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 539 F.3d 159, 166 (2d Cir. 2010) (citations omitted).  Only disputes over material facts – i.e., "facts that might affect the outcome of the suit under the governing law" – will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

In the matter before this Court, the parties have agreed that resolution by summary judgment is appropriate.  While each party urges its construction, neither urges that a triable issue of fact exists. The Court agrees.

## Insurance Contracts

Both parties agree that New York law applies to the insurance contract dispute before this Court.  New York law requires that the Court interpret the Policy in a manner that gives effect to the intent of the parties as expressed by the unambiguous terms of the contract.  See Village of Sylvan Beach v. Travelers Indem. Co., 55 F.3d 114, 115 (2d Cir. 1995).  That the parties may urge different interpretations of the same contractual language does not create an ambiguity – nor mean that an ambiguity necessarily exists.  See Seiden Assocs., Inc. v. ANC

Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992).  The Court should construe terms according to their plain and ordinary meaning.  See Gov't Employees Ins. Co. v. Kligler, 42 N.Y.2d 863, 864 (1977).  The Court cannot rewrite the Policy to better correspond to the Court's notions of fairness and equity.  See Greenfield v. Philles Records, 98 N.Y.2d 562, 569 (2002).  Nor can the Court rewrite the Policy to expand coverage beyond that provided for in the contract.  See Cornellier v. Am. Casualty Co., 389 F.2d 641, 644 (2d Cir. 1968).

New York law recognizes the doctrine of contra proferentem: if a court has determined an ambiguity exists, the insurer carries a heavy burden and ambiguities should be resolved in favor of the insured.  See Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co., 472 F.3d 33, 43 (2d Cir. 2006); Andy Warhol Fdn. for the Visual Arts, Inc. v. Fed. Ins. Co., 189 F.3d 208, 215 (2d Cir. 1999).

## Relatedness

This Court's determination on this motion is whether KPF's design error with respect to the Ice Control Issue "aris[es] from" or is "related to" the same wrongful act or omission as the design error with respect to the Steel Girt Tolerance Issue.

A key question is what the phrase "related to" means – is it unambiguous or ambiguous?[3]  A number of courts have examined the question of whether the phrase "related to" in an insurance policy is ambiguous. Cases finding no ambiguity include: Berry & Murphy, P.C. v. Carolina Casualty Ins. Co., 586 F.3d 803, 810

---

[3] As set forth supra, if the phrase is unambiguous, then the doctrine of contra proferentem dictates that Continental (as the insurer) bears a heavy burden and ambiguities are resolved in favor of DASNY (as the insured).

(10th Cir. 2009) (interpreting "related wrongful act" and finding the phrase not ambiguous); Continental Cas. Co. v. Wendt, 205 F.3d 1258, 1262-63 (11th Cir. 2000) (referring to the plain meaning of the word "relate" as showing or establishing "causal connection between"); Gregory v. Home Ins. Co., 876 F.2d 602, 605-06 (7th Cir. 1989) (same); Bryan Bros., Inc. v. Continental Cas. Corp., 704 F. Supp. 2d 537, 543 (E.D. Va. 2010) (finding the phrase "interrelated acts or omissions" not ambiguous); Continental Cas. Co. v. Howard Hoffman and Assoc., 955 N.E.2d 151, 163 (Ill. App. Ct. 2011), reh'g denied (2011), appeal denied, 963 N.E.2d 244 (Ill. 2012) (phrases "related claims" and "related acts or omissions" not ambiguous). Finding ambiguity are cases such as: National Union Fire Ins. Co. of Pittsburgh, PA, v. Ambassador Group, Inc., 691 F. Supp. 825 (E.D.N.Y. 1988) (legally distinct claims that alleged wrongs to different people not "the same or interrelated"); Home Ins. Co. of Ill. V. Spectrum Info. Tech., Inc., 930 F. Supp. 825, 847-48 (E.D.N.Y. 1996) (later asserted claims were not the same "wrongful act or interrelated, repeated or continuous wrongful acts" since they were distinct); David v. Am. Home Assur. Co., 95 Civ. 10290, 1997 WL 160367, at *3 (S.D.N.Y. Apr. 3, 1997) ("interrelated" acts or "one or more series of interrelated acts" creates ambiguities). The parties have cited these cases in support of their respective positions. (See, e.g., Pl's Mem. at 17-19; Def.'s Opp'n at 6-11.)

The Court looks first to the Policy to determine what "related wrongful acts" (emphasis added) means. Neither party argues that the Steel Girt Tolerance Issue and the Ice Control Issue are the "same" wrongful act.

That the Policy does not have a specific definition of the phrase "related wrongful acts" does not itself render that phrase ambiguous.  (See Policy at 4-8.) Rather, the Court asks whether the words are, in the context of the Policy, open to differing but reasonable interpretations.  See Luitpold Pharm., Inc. v. Ed. Gesitlich Sohne A.G. Fur Chemische Industrie, 11 Civ. 681, 2013 WL 208908, at *6 (S.D.N.Y. Jan. 15, 2013).  The Policy does define the phrase a "related claim" in a manner that assumes that the word "related" is used with its ordinary meaning but that the word "claim" may need further explanation.  That phrase is defined as "related to a single act or related wrongful acts".  (See Policy at 7.)

Continental's insurance policy expert, Conroy, testified that "related" means a common nexus or set of facts that are sufficiently similar.  (See Page Letter Sub. Ex. 1 at 58.)  He also stated that "related" means "connected or linked."  (Id.) Conroy agreed that while some things may theoretically have a relationship – philosophically or otherwise – that does not make them "related" for insurance coverage purposes.  For instance, he agreed that while every claim that arises in New York City is definitionally related because there is some connection between those claims (e.g., they happened to arise in New York), there would not be a "sufficiency of facts" to be deemed related due only to that reason for insurance coverage purposes.  (Id. at 60.)  When he was asked whether "related is not just the fact that there is some nexus, but [that] there has to be some sufficiency of nexus for it to be deemed related," he testified, "[y]es, I would agree with that."  (Id.)

DISCUSSION

Is the Ice Control Issue related to the various wrongful acts set forth in the May 30, 2002 Demand?  The question is a mixed question of law and fact: it is a legal question insofar as the word "related" is open to legal construction; it is factual to the extent that the Court must determine whether the design issues relating to the exterior wall's steel girt tolerances are <u>as a matter of fact</u> related to the exterior wall's Ice Control Issues.

As an initial matter, the Court finds the phrase "related to" as used in the Policy to be unambiguous.  Its plain and ordinary meaning here suggests factual connection; to be "related" there must be some factual tie.  As Conroy, Continental's expert argued, it means connected to linked, and that there exists some sufficiency of facts.  This meaning is a plain and ordinary one  (indeed, Webster's Third New International Dictionary defines "related" as "connected by reason of an established or discoverable relation").  Nothing in the Policy or the record of this case suggests that the phrase "related to" has been or should be given special meaning.  Thus, having determined that "related to" means just what is says, the Court turns to the factual question of whether the design issues that resulted in the Ice Control Issue is related to the design error that led to the Steel Girt Tolerance Issue.  The factual record before the Court is one sided in this regard:  there is no triable issue of fact.  The design errors are different in the critical and dispositive ways discussed <u>infra</u>; they are not "related to" one another.

16

As outlined above, there is no dispute that ice and snow accumulation concerns had been raised by DASNY with KPF in 2001.  It is also not disputed that the Ice Control Issue was not explicitly raised in the May 30, 2002 Demand.  The parties do dispute whether DASNY and KPF recognized the significance of the Ice Control Issue at the time the May 30, 2002 letter was sent – or whether its significance was only recognized later.  However, the resolution of that dispute is unnecessary to resolution of this motion.

There is no dispute that KPF did the design work relating to the exterior wall – design work found to be defective several different respects. The engineers who reviewed the issue over the years agree that KPF failed to correctly assess necessary steel girt tolerance for attaching various pieces of the exterior wall to one another; and that KPF failed to account for the snow and ice accumulation that would result from the sloped exterior wall combined with the flutes that collected snow and ice – creating the bobsled run DASNY's Bartlett testified about.  (See Chin Report; see also Froessel Aff. Exs. 8 (report prepared by WJE), 14 (RWDI), 15 (Superstructures Engineers & Architects).)

There is no factual dispute that the Ice Control Issue relates to "aesthetic" design.  The steel girt issue was technical in nature.

The thrust of Continental's position in this litigation is that the design of a sloped exterior necessarily means that all issues arising from that design are related.  There is no support for this assertion in the factual record.  At most, Continental makes the assertion and points to the fact that both errors generally

relate in some way to the exterior wall.  That is insufficient.  If it were the case, then if windows later fall off the building because of the sloped exterior, that would also be "related" to the issues set forth in the March 30, 2002 Demand; if birds fly into the building in larger numbers than is typical due to reflection off the slope, and they then slide down and hit pedestrians – that could also "relate" to the Steel Girt Tolerances.  There are many such examples which only serve to demonstrate the reasonableness of the requirement that to "relate" to the design error here requires factual <u>linkage</u>, factual connection of the error.  That is, there must be factual linkage of one or more aspects of the design that gave rise to the issue.

The Court's rationale is supported by the views of both parties.  It is DASNY's position, with which Continental's expert Conroy agrees, that to "relate to" something requires some link or connection – some sufficient factual basis.  (<u>See</u> Page Letter Sub. Ex. 1 at 60.)  But apart from the fact that the design issues both generally relate to the exterior of the building, there is no such connection.  That is not enough.  For instance, the unrebutted facts are that different design teams worked on the two different issues, that the two issues involve different architectural considerations, that they resulted in different harms, and that they caused harm at different times.  Moreover, the Ice Control Issue could not occur in fact until the Steel Girt Tolerance Issue had been <u>resolved</u> and the building's exterior panel system (including the flute "bobsled" tracks) attached.

It is also persuasive that Continental's Corporate Representative, Patrick Marciano, testified that other than the fact that the two issues relate to the same

final set of plans that KPF was responsible for, he did not know of any other relationship or connection between the two issues. (Page Letter Sub. Ex. 2.) No one can seriously argue that the mere fact of common design creates relationships for coverage purposes; that is only a step away from the issues being related because they both occur on or at the same building.

It is true that when DASNY made May 30, 2002 Demand, it purposefully drafted numbered paragraphs outlining the steel girt design issues, but then also included a "catch-all" provision: "KPF's failure to recognize and correct design errors and omissions and otherwise inadequate or negligent responses to errors in its design." (Lodge Aff. Ex. B at 2.) But it is too much to say that this catch-all arguably captures additional, and not then intended design errors relating to all aspects of the project or even the exterior wall. The only logical reading of that paragraph is that it is referring to KPF's failure to recognize the design errors referred to in the letter and KPF's in adequate or negligent response to those errors in its design – not others not contemplated in the Demand at all.

The phrase "related to" is not ambiguous here; being part of an overall exterior wall structure is simply not enough to render one design error resulting in one totally different set of problems, designed by different teams, stemming from different causes, and resolved independently, being related to another.[4]

---

[4] Even if, however, the Court were to deem the phrase "related to" as ambiguous, the doctrine of contra proferetem would require any ambiguities to be resolved in favor of DASNY. Continental has not carried its heavy burden to prove otherwise. Continental has relied on a lack of ambiguity for its position and not put forward a robust factual record suggesting that if the Court finds otherwise, it has met its burden. It does not seriously try to protect this avenue of decision. This provides a separate, and independent, basis for granting DASNY's motion.

CONCLUSION

For the reasons set forth above, plaintiff's cross-motion for summary judgment is GRANTED, and defendant's motion for summary judgment is DENIED.

The complaint in this action seeks a declaratory judgment, "together with an award of the amount specified by the parties as due upon such declaration." (ECF No. 1 at 6.) The parties are directed to jointly submit any proposed form of judgment – if necessary – no later than March 16, 2013.

The Clerk of the Court is directed to terminate the motions at ECF Nos. **27** and **34**.


SO ORDERED.

Dated:  New York, New York
        March 5, 2013


                              _____
                              KATHERINE B. FORREST
                              United States District Judge